OPINION OF THE COURT
Eugene M. Fahey, J.
Petitioner, Buffalo and Fort Erie Public Bridge Authority *160 (hereinafter Petitioner PBA), brings this proceeding seeking a judgment pursuant to CPLR article 78 directing respondent, City of Buffalo (hereinafter Respondent City), and respondent, Anthony M. Masiello, as Mayor of the City of Buffalo (hereinafter Respondent Mayor), to grant and execute a permanent bridge easement relating to certain City-owned parcels of land and declaring that Petitioner PBA has rightful claim to said easements.
The petition is denied and dismissed.
In 1933 (L 1933, ch 824), the New York State Legislature enacted and the Governor approved the creation of Petitioner PBA, and granted it powers to initially acquire, and subsequently maintain and operate, the then privately owned Buffalo and Fort Erie Public Bridge Company. The Company was the owner and operator of the Peace Bridge, constructed in 1927 as the principal road link between western New York and Canada.
Over the last number of years, as traffic increased over the bridge, major congestion delays have made it apparent to responsive governmental agencies in the United States and Canada, and informed public opinion, that some method of dramatically increasing traffic flow between Fort Erie and Buffalo was required.
In this regard, Petitioner PBA began the Peace Bridge Capacity Expansion Project in the early 1990’s, the inter-linked Bridge Capacity Project, the Commercial Vehicle Processing Center in Canada, the Canadian Plaza/Gateway Project and the United States Plaza/Connecting Roadways Project with the “overall cumulative * * * goal * * * to minimize delays experienced by vehicle traffic moving through Peace Bridge Facilities” {see, Petitioner PBA Peace Bridge Capacity Expansion Final Environmental Assessment, comment 89, at 95).
Petitioner PBA determined to proceed with the companion bridge on July 24, 1998, which required obtaining easements over two parcels of land owned by Respondent City and such a request was forwarded to respondent, Joseph M. Giambra, City of Buffalo Commissioner of Public Works (hereinafter Respondent Commissioner Giambra).
Respondent Commissioner Giambra then transmitted his recommendation to respondent Common Council of the City of Buffalo (hereinafter Respondent Common Council) that said easements be granted on September 3, 1998.
*161 On October 8, 1998, Respondent Common Council unanimously passed this resolution, which reads in its entirety: “That the mayor be, and he hereby is authorized to enter into permanent easement agreements with the Buffalo and Fort Erie Public Bridge Authority, in a form approved by the Corporation Council, for two (2) parcels of City-owned land as described and shown on the maps attached to the above communication for the construction of the new twin bridge recently approved by the Public Bridge Authority and subject to the approval by the City of Buffalo of the Peace Bridge’s Maintenance and Protection of Traffic Plan for the construction of the twin bridge.”
Respondent Mayor Masiello then signed the resolution accepting the authorization of authority on October 16, 1998.
Subsequent to the Council action, by letter dated December 23, 1998 and addressed to Respondent Commissioner Giambra, Petitioner PBA’s counsel, Lawrence K. Rubin, Esq., memorialized certain terms of the easement agreement, including a $125,000 payment by Petitioner PBA to Respondent City in lieu of assuming costs for temporary detours created by construction. The letter went on to ask Respondent Commissioner Giambra to send a letter that the traffic plan was approved “thus satisfying the contingency in the Common Council Resolution approving the granting” (Petitioner PBA exhibit 30, at 4). The letter then confirmed that the City Law Department had agreed to the form of the easement document and indicated that they would like the easement document executed by the Mayor as soon as possible.
By letter dated March 1, 1999, Attorney Rubin again wrote Respondent Commissioner Giambra detailing certain aspects of the traffic plan and asking Giambra to sign if the plan was acceptable. Giambra duly signed the letter on March 3, 1999.
In March and April 1999, Respondent Common Council first repudiated and upon Mayor Masiello’s request, formally rescinded its authorization to enter into the easement agreement. Mayor Masiello never signed the agreement.
The court has had occasion to review the Buffalo City Charter. It provides under article 4, section 65 that the Mayor shall be the chief executive officer of the City with inherently strong powers. Article 27 of the Buffalo City Charter requires a grant of authority by the Common Council to the Mayor before he has authority to buy or sell property. Under article 27, section 518, it provides that “Each conveyance or lease of real property owned by the city shall be executed by the mayor and shall have the corporate seal of the city affixed thereto”.
*162 In its memorandum of law, Petitioner PBA asserts that Mayor Masiello had a ministerial, nondiscretionary duty to execute the easement agreement, that the October 8 Council Resolution (Resolution) required him to do so. At oral argument, it asserted that his signature to the October 8 Resolution irrevocably bound the City to the agreement.
There are fatal flaws to all these arguments. The Resolution authorized the Mayor to enter into an agreement; it did not under these circumstances obligate him. Accepting a grant of authority is not the same as a requirement to exercise the authority. By signing the Resolution, the Mayor accepted the grant of authority to act, but he did not obligate himself to act in a specific manner. He did not give up the inherent discretion lodged in his office to later decide not to execute the grant.
This distinction is illustrated by Arcangel v Holling (258 App Div 180 [4th Dept 1939]), cited by Petitioner PBA. There, the Buffalo Common Council authorized the lease of a certain portion of Buffalo airport property. The Mayor then vetoed the resolution, the Council overrode the veto and the Corporation Council proposed a formal lease, which the Mayor refused to execute.
In affirming the lower court order that the Mayor execute the lease, the Court highlighted when the Mayor’s act is non-discretionary, but ministerial in nature. This occurred after a mayoral veto and override by the local legislative body. Arcangel (supra) is distinguishable from our own case in that the Common Council took no further action after authorizing the grant, until it rescinded the authorization.
Respondent City’s citing of Cicalo v New York City Hous. & Dev. Admin. (79 Misc 2d 769) moves this court to the central facet of this case; that being, the degree of discretion enjoyed by the Mayor prior to his execution of an easement grant pursuant to article 27, section 518.
In Cicalo (supra), the petitioners sought to develop and construct a limited profit cooperative housing venture in Brooklyn and duly submitted their plans to respondent City of New York’s Housing and Development Administration, which approved the project and transmitted its plans to the City Planning Commission. The Commission in turn approved the project and recommended its adoption to the City Board of Estimate.
Thereafter, the Board, by resolution, approved the project, authorizing the City Housing and Development Administration *163 to enter into a loan contract and authorized acquisition of a portion of the property site through condemnation. The acquisition resolution read in part “upon direction by the Mayor, the Corporation Counsel * * * is hereby authorized * * * to institute condemnation proceedings”. (Cicalo v New York City Hous. & Dev. Admin., supra, at 771.)
The condemnation agreement, executed by the petitioners there and the City Housing and Development Administration, read in part “Upon request of [petitioners] and issue by the Mayor of the City, in his discretion, of a certificate directing acquisition”. (Cicalo v New York City Hous. & Dev. Admin., supra, at 771.)
Community opposition arose. The Mayor then refused to issue a condemnation certificate. The Board of Estimate introduced and withdrew a resolution rescinding its approval, resulting in no action. It then refused to go forward.
Petitioner then sued to compel the Mayor to issue the condemnation certificate, arguing that it was a purely ministerial act.
The court rejected the claim, holding that there was no enforceable agreement and that it had no power to compel the Mayor to act.
The rationale of the court developed in this manner. The City Board of Estimate was essentially a legislative body, as is Respondent Common Council here. Although the Mayor was a member of the Board, “[h]owever, he is pre-eminently the city’s chief executive and administrative officer. In this capacity, he executes the laws and resolutions passed and adopted by the City Council and the Board and administers the city government. Inherent in his office is necessarily a vast discretion. The Board resolutions and the agreement did not mandate the Mayor to issue a certificate of condemnation. It is doubtful that they could lawfully do so.” (Cicalo v New York City Hous. & Dev. Admin., supra, at 772.)
The court went on to examine the general powers of the Mayor under the New York City Charter, concluding that the residual powers of City government are vested in the Mayor, a conclusion we share as it relates to Respondent City of Buffalo. The court then examined (1) the condemnation section to the Charter (“ ‘the mayor * * * may * * * direct such acquisition,’ ” Cicalo v New York City Hous. & Dev. Admin., supra, at 773), (2) the acquisition resolution (“ ‘upon direction by the Mayor,’ ” supra, at 773), and (3) the condemnation agreement (“ ‘in his *164 discretion * * * directing acquisition,’ ” supra, at 773). It then concluded:
“The statutory language and the provisions of the resolutions and the agreement preclude a finding that the Mayor’s action was to be or is a mere formality. Nor is there merit to the contention that the alleged actions of the Mayor in routinely issuing other condemnation certificates is proof such action is a mere formality and not an exercise of discretion.
“No court can compel the Mayor to exercise his discretion in the manner sought by plaintiffs. The law has placed upon him the responsibility of carrying out the provisions of the charter and other provisions of the law. If he fails properly to exercise his discretion the remedies lie elsewhere. Mandamus lies only where the act is purely ministerial (Matter of Walsh v. LaGuardia, 269 N. Y. 437).” (Cicalo v New York City Hous. & Dev. Admin., supra, at 773-774.)
The parallels between Cicalo (supra) and the facts in this case are nearly absolute.
Article 4, section 65 of the Buffalo City Charter gives the Office of Mayor strong inherent powers, except as otherwise provided. Thus, he has the same sort of residual governmental power as is seated in the mayoralty by the New York City Charter.
However, he may not unilaterally buy, sell, or lease any City interest in real property. Article 27 of the Buffalo City Charter requires a grant of authority by the Common Council to the Mayor before he has authority to act. Article 27, section 518 specifically requires that each conveyance be executed by the Mayor with the corporate seal attached.
Here, the City through various agencies conducted preliminary negotiations with the PBA to convey the easements. It also recommended to the Common Council that the easements be granted. The Council authorized the Mayor to grant the easements contingent on two City agencies’ approval. The agencies approved. Community opposition to the project arose. The Mayor refused to execute the grant, in a lawful act, within the exercise of his discretion. That refusal meant the agreement between the City and the PBA never became legally binding. There is no enforceable agreement.
The court notes the various cases cited by Petitioner PBA. None are persuasive. Matter of Kennedy v Macaluso (86 AD2d 775 [4th Dept 1982]) involved the ministerial duty of an attorney in a matrimonial matter and is completely irrelevant. *165 The court has dealt with Arcangel (258 App Div 180, supra) which involves a Council veto overriding the Mayor’s discretion and rendering his function ministerial.
Matter of Oystermen's Dock Co. v Downing (258 NY 156 [1932]) involved a town supervisor’s refusal to convey land after the Town Board acted, where the Town Law expressly gives total authority to convey land to a majority of the Town Board.
Municipal Consultants & Publs. v Town of Ramapo (47 NY2d 144 [1979]) likewise involved the Town Law’s placement of exclusive authority to contract in the Town Board, in holding no supervisor’s discretion in signing the contract. Again, totally distinguishable from our own case. The court has also examined Universal By-Prods. Corp. v Schwartz (216 App Div 311 [4th Dept 1926]) which involves allegations of irregularities in the City of Buffalo’s bidding practices under an earlier City Charter and is irrelevant.
Rock Ridge Townhouses v Village of Tupper Lake (99 AD2d 914 [3d Dept 1984]) involves a village Board of Trustees’ creation of a binding contractual obligation and is no more relevant than the Town Board cases above.
Village of Lake George v Town of Caldwell (3 AD2d 550 [3d Dept 1957]) and Orelli v Ambro (51 AD2d 85 [2d Dept 1976]) are other irrelevant Town Board cases.
The court need not discuss the other cases cited by the Petitioner PBA, in that they assume the creation of vested rights on the part of the PBA, on the basis of the creation of a binding contract, when there was none.